UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Scotty Floyd,


Plaintiff,


vs.                                        REPORT AND

RECOMMENDATION

Marty Anderson, Warden;
T.C. Peterson, Warden; Dr.
George Santini; P.A. C. Reudy;
P.A. Edmonds; P.A. Liz Evans;
H.S.A. Furtnenz; Asst. H.S.A.
Val Encarnanze; C.R.N.P Muth;
H.S.A. Chapman; P.A. Bea
Glavinovich; and Does 1-20,


Defendants.                    Civ. No. 04-3047 (ADM/RLE)

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title

28 U.S.C. § 636(b)(1)(B), upon the Defendants' Motion to Dismiss or,

1

Alternatively, for Summary Judgment.  For these purposes, the Plaintiff appears

pro se, and the Defendants appear by Patricia R. Cangemi, Assistant United States

Attorney.     For reasons which follow, we recommend that the Defendants'

Motion for Summary Judgment be granted, and that the Plaintiff's Complaint be

dismissed.[1]

## II.  Factual and Procedural Background

The Plaintiff is a Federal prisoner who is incarcerated at the Federal Correctional

Institution in Sandstone, Minnesota ("FCI-Sandstone").  He commenced this action

under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), alleging that the

medical care that he had received following an injury to his ankle was so deficient as

to constitute a violation of his Eighth and Fourteenth Amendment rights.  The Plaintiff

has also alleged that the Defendants' conduct renders them liable for "Intentional

infliction of physical stress; Negligent infliction of physical stress; Malfeasance of

---

[1]The Record is bereft of proof that service of process has been effected upon
Z. Gutierrez, Liz Evans, Val Encarnanze, Bea Glavinovich, C.R.N.P. Muth, and
H.S.A. Furtnenz. Given the absence of any cognizable constitutional claim against any
of those persons, we recommend that they be dismissed from the Complaint for want
of personal jurisdiction. Further, in the event that service of process had been effected
on those individuals, we still recommend dismissal, since there is nothing in the
Record that would distinguish their conduct from that of the other Defendants who
had been properly served.

office; Abuse of position; Maleficence; and Maliciousness."  Complaint, at p. 6.

On September 20, 1998, the Plaintiff was playing basketball with other prisoners at FCI-Sandstone, when he sustained an injury to his left ankle. "Statement of Claim", at p. 1, Docket No. 2.  The following day, he informed a Unit Officer, who is identified as Bill Forrest ("Forrest"), about his injury.  Forrest examined the Plaintiff's ankle, and placed a call to medical staff, advising them of the Plaintiff's injuries.  Id.  For reasons that are not specified, the medical staff were unable to treat the Plaintiff on that day, but advised him to make an appointment for the following day.  Id., at pp. 1-2.

On September 22, 1998, the Plaintiff was examined by the Defendant Liz Evans ("Evans"), concerning the Plaintiff's complaint that he was unable to put weight on his ankle.  Declaration of Dr. George Santini ("Santini Decl."), at ¶3., Exh. A, at unnumbered p. 40.  Evans observed that the Plaintiff's ankle had a decreased range of motion, limited swelling, and tenderness.  Id. at ¶3, Exh. A at unnumbered p. 39.  She also noted that the Plaintiff's perception of his pain was out of the ordinary for his injury.  Id.  Evans ordered left ankle x-rays, which  did not reveal any fractures or bone abnormalities, and diagnosed the Plaintiff with a left ankle sprain.  She also provided the Plaintiff with crutches, a posterior splint, and Tylenol, and directed that he be placed on medical quarters restrictions for six (6) days.  The Plaintiff was also

3

provided with crutches, a posterior splint, and Tylenol.[2]

On September 29, 1998, the Plaintiff was examined by Physicians Assistant Edmond ("Edmond"), as a follow-up to the Plaintiff's previous visit. Edmond noted marked swelling in the Plaintiff's fore foot and left lateral malleolus,[3] with malleolar pain and tinea pedis.[4] <u>Santini Decl.</u>, at ¶4, Exh A at unnumbered p. 39. Edmond applied a splint to the Plaintiff's ankle, and directed that he be restricted to his living quarters for an additional seven (7) days, that he refrain from weight bearing activities, and that a follow up visit be scheduled in six (6) days. <u>Id.</u> Edmond also noted that he was awaiting a radiological report. <u>Id.</u>

On October 6, 1998, the Defendant was examined by C.R.N.P. Muth ("Muth"), on the follow-up visit to the September 29, 1998 examination. <u>Id.</u>, at ¶5, Exh. A at unnumbered p. 38. Muth noted that the Plaintiff's pain was being managed through

---

[2]Tylenol is "the trademark for preparations of acetaminophen," which is defined as "a nonprescription drug having analgesic and antioyretic effects similar to aspirin, but only weak anti-inflammatory effects." <u>Dorland's Medical Dictionary</u>, at pp. 12, 1902 (29th ed. 2000).

[3]Malleolus is "a general term for a rounded process, such as the protuberance on either side of the ankle joint." <u>Dorland's Medical Dictionary</u>, at p. 1051 (29th ed. 2000).

[4]Tinea pedis is "tinea involving the feet" or "athlete's foot." <u>Dorland's Medical Dictionary</u>, at pp. 1843 (29th ed. 2000).

medication, that there was no acute distress, and that the x-rays had come back negative. The Plaintiff's splint was removed, which revealed no swelling, or lesions, and Muth encouraged the Plaintiff to place weight on his ankle, and to demonstrate range of motion. The Plaintiff verbalized an understanding to move his foot, and Muth directed the Plaintiff to refrain from any prolonged standing, running, or sports. Id. Muth discontinued the Plaintiff's use of crutches, and provided him with a wrap to support his ankle. Id. The Plaintiff was directed to return for a follow up visit during the week of October 26, 1998.

On October 26, 1998, the Plaintiff was examined by Evans, who noted that the Plaintiff was doing well, performing self exercises, with no real problems. Id. at ¶6; Exh. A at unnumbered p. 37. Evans did not observe any acute distress, and noted that the Plaintiff was able to bear his full weight on the injured ankle. Id. Evans assessed the Plaintiff's ankle sprain as having been "fully resolved," but directed the Plaintiff to continue self physical therapy, and return to the clinic, on an as needed basis. Evans also provided the Plaintiff with Motrin,[5] and ordered another series of x-rays.

---

[5]Motrin is "a trademark for a preparation of ibuprofen", which is "a nonsteroidal analgesic, antipyretic, and anti-inflammatory agent that is a propionic acid derivative; used for relief of pain, reduction of fever, and in the treatment of osteoarthritis and rheumatoid arthritis." Dorland's Medical Dictionary, at pp.1134, 872 (29th ed. 2000).

5

On November 11, 1998, the Plaintiff was examined by Muth for heel pain, which was noted as being unrelated to his ankle injury.  Id., Exh A at unnumbered pp. 36-37. He was diagnosed with probable heel fascititis, and was provided with  Motrin.  Muth also discussed with the Plaintiff the possibility of purchasing insoles for his shoes.

On December 11, 1998, the Plaintiff was again examined by Edmond for complaints of heel and ankle pain.  Id. at ¶7, Exh. A at unnumbered p. 35.  Edmond observed that there was no acute distress, or tenderness, or swelling in Plaintiff's ankle, that he had a full range of motion, and walked with a normal gait.  Edmond also noted that the x-rays had come back negative for fractures.  The Plaintiff was assessed with chronic ankle pain, and was advised to elevate his ankle, and use ice as needed. Upon the Plaintiff's request, Edmond provided him with a refill of Motrin.

On January 8, 1999, the Plaintiff was examined by Muth for complaints of continuing ankle pain.  He also complained about not having been made aware of the x-rays results for both his heel, and his ankle.  Id. at ¶8, Exh. A at unnumbered p. 34. Muth explained that, in order to have such complaints addressed, the Plaintiff needed to make a sick call.  However, Muth  proceeded to explain, in detail, the results of the two x-ray series on his ankle, and the one x-ray series on his heel.  The Plaintiff expressed concern in the language of the x-ray Report, which explained the x-ray

6

results as follows:

> There are multiple tiny, well corticated old avulsions from
> the tip of the medial malleolus. There is soft tissue swelling
> over the lateral malleolus, There may be small ankle joint
> effusion. Mild degenerative changes are noted in the
> intertarsal articulation. There is mild irregularity of the
> lateral cuboid, probably an old avulsion. No other
> abnormalities are seen.

Id., Exh. A at unnumbered p. 59; Statement of Claim, at p. 5.

Muth explained that the "old avulsions" referred to in the report pertained to an injury

that could have been several years old, and was not necessarily the result of the

incident on September 20, 1998.[6]

On January 13, 1999, the Plaintiff submitted a request to the Defendant Zandra

Gutierrez ("Gutierrez"), who is identified as a Health Care Administrator at FCI-

Sandstone, for Gutierrez to advise him as to why he was not informed of his x-ray

results. Id., Exh. A at unnumbered p. 117. Gutierrez responded shortly thereafter by

advising the Plaintiff to make a "sick call" to discuss his medical concerns.

---

[6]The Plaintiff has taken exception to the characterization that the avulsions could
have been several years old, and has asserted that he did not have any ankle, heel, or
foot problems, prior to the injury of September 20, 1998. See, Statement of Claim,
at p. 17. However, he has not offered any medical evidence to refute the conclusions
stated in the x-ray Report, which were reiterated by the medical personnel at FCI-
Sandstone.

On January 21, 1999, the Plaintiff was again examined by Muth, on complaints of pain in his left foot.  Id., Exh. A at unnumbered p. 33.  Muth noted that there was no tenderness or change in the Plaintiff's mobility, and that the Plaintiff stated that his shoes fit him comfortably.  Based on her examination, Muth made no assessment. However, she again explained to the Plaintiff the results of his x-rays, and provided him with the dates of the x-rays, so that he could obtain requested copies of the x-ray reports.  She also informed the Plaintiff that he had been placed on a list to receive "soft shoes" although there was no guaranty that such shoes would alleviate the pain in his heels.

On January 31, 1999, the Plaintiff submitted two requests to Gutierrez, one of which requested to know why the medical staff at FCI-Sandstone did not provide him with his x-ray results, and did not treat his injury in its entirety, which, he asserted, was a violation of Bureau of Prison ("BOP") policy.  Id., Exh. A at unnumbered p. 114. Gutierrez responded be reminding the Plaintiff that he had been seen on sick call on January 8, 1999, and January 21, 1999, that the results of the x-rays had been discussed with him during those visits, and that his complaints of ankle problems were being addressed.  The second request was to receive a "softer shoe or boot."  Id., Exh. A at unnumbered p. 115.  Gutierrez responded by advising the Plaintiff to make

8

a sick call, in order to discuss the matter.

On February 26, 1999, the Plaintiff was examined by Edmond, on the Plaintiff's request for pain medication.  Id., Exh. A at unnumbered p. 31-32.  Edmond observed that the Plaintiff had normal strength, and walked with a normal gait.  He was assessed with mild arthritis in his left ankle and was advised to make a follow-up sick call.  On April 15, 1999 the Plaintiff was examined by Physicians Assistant C. Ruedy ("Ruedy"), on complaints of ankle pain.  Id., Exh. A at unnumbered p. 31.  Ruedy did not observe any evidence of swelling, or deformity, and noted that the Plaintiff had good circulation and normal ambulation.  Ruedy  reviewed the x-rays, and further observed that there were no physical findings to support the Plaintiff's assertions of chronic pain.

On April 23, 1999, the Plaintiff again submitted a request to Gutierrez seeking to be informed in more detail of the x-ray results, based on his contention that Ruedy showed the x-rays, but failed to explain any of the problems, and did not explain his conclusion that the x-rays did not reveal any problems with the Plaintiff's ankle.  Id., Exh. A at unnumbered p. 113.   The Plaintiff was advised to make a sick call appointment to address his medical concerns.

On April 28, 1999, the Plaintiff submitted a request to Gutierrez that he be

referred for an orthopedic examination of his ankle, complaining that he had not fully recovered from the ankle injury of September 20, 1998.  Id., Exh. A at unnumbered p. 112.  Gutierrez advised the Plaintiff that he needed to make a sick call appointment in order to address his medical complaints, including a possible referral to a specialist.

On May 13, 1999, the Plaintiff was examined by Muth, on his complaints of ankle pain.  Id., Exh. A at unnumbered p. 29.  The Plaintiff advised that he was still able to play basketball, but that he had quit running.  He also informed Muth that he had used an ankle brace when running.  Muth observed that the Plaintiff had a steady gait, no acute distress, minimal swelling, no tenderness, no discoloration, and an improved range of motion.  Muth reviewed the x-rays with the Plaintiff, directed him to begin specific range of motion exercises, and provided him with Tylenol.

On June 18, 1999, the medical staff at FCI-Sandstone contemplated placing the Plaintiff on a six (6) month recreational restriction, and purportedly provided the Plaintiff with a slip containing such restrictions.  Id., at unnumbered p. 28; Statement of Claim, at p. 9.  Later that day, the medical staff decided to remove such a restriction, and directed the Plaintiff to return the slip.

On June 25, 1999, the Plaintiff was examined by Reudy, who observed that the Plaintiff was walking with a normal ambulation, up and down stairs, that there was no

visible swelling, or acute distress, and that the Plaintiff had a full range of motion.  Id. at ¶11, Exh. A at unnumbered pp. 27-28.

On July 1, 1999, the Plaintiff submitted a second request to Gutierrez to have his ankle examined by an orthopedic specialist.  Id., Exh. A at unnumbered p. 110. Gutierrez advised the Plaintiff to make a sick call and, on July 28, 1999, the Plaintiff was examined by Dr. Carlson, who is an orthopedic specialist.  Id. at ¶12, Exh. A at unnumbered p. 62.  Carlson observed that there was no swelling and some tenderness in the Plaintiff's ankle at the time of the examination, but that there did not appear to be any significant instability in drawer testing or inversion or eversion.  Carlson also reviewed the x-rays that were taken on December 2, 1998, which had noted mild degenerative changes.  Carlson also noted that the medial malleolus did show evidence of post trauma.  Carlson diagnosed the Plaintiff with a left ankle sprain, with early degenerative changes, and recommended that the Plaintiff utilize an ankle air brace, or ankle brace, when playing basketball.  He also recommended that the Plaintiff take Ibuprofen on an as needed basis, in order to reduce swelling.  Carlson advised that if the recommended treatment was not successful, that the Plaintiff should return on an

as needed basis.[7]

On August 10, 1999, the Plaintiff submitted a request to Gutierrez, in which he informed her that his ankle started "locking up" while he was playing basketball.  Id., Exh. A at unnumbered p. 108.  He also requested that he be provided with the medication and ankle brace that had been recommended by Carlson.  Gutierrez advised the Plaintiff that he had already been provided with the recommended Motrin, pursuant to Carlson's instructions, and that a brace would be ordered, if deemed appropriate by the Clinical Director.

On August 17, 1999, the Plaintiff was seen by Dr. George Santini ("Santini"), who was the Clinical Director at FCI-Sandstone during the relevant time period.  Id. at ¶17, Exh. A. at unnumbered p. 26.  The Plaintiff complained to Santini of ankle pain while exercising.  Santini observed that the Plaintiff had a normal range of motion, and minimal swelling in his ankle.  He assessed the Plaintiff with an ankle strain, and recommended that he refrain from sports which involve stress on the injured ankle.

---

[7]The Plaintiff contends that he and Carlson had verbally discussed the possibility of conducting a surgical procedure, and that Carlson had directed that he return for a follow-up visit after approximately two (2) months.  These verbalizations are not reflected in the Carlson's examination report, which makes no mention of a need for surgery, and explicitly states that Plaintiff should return "as needed."  See Santini Decl., Exh. A at unnumbered p. 62.

Santini also provided the Plaintiff with a sixty (60) day prescription of Naproxen,[8] and advised that the Plaintiff return to the clinic in one (1) or two (2) weeks, if the injury did not improve.   Purportedly, Santini verbally directed the Plaintiff to refrain from recreational activities for two (2) months.   Statement of Claim, at p. 12.

On August 18, 1999, the Plaintiff submitted a request to Gutierrez seeking an explanation as to why he had not received the ankle brace that had been recommended by Carlson.   Gutierrez advised the Plaintiff that he should address his medical concerns during "sick call," or with herself during "mainline."   Santini Decl., Exh. A at unnumbered p. 104.   On August 19, 1999, Santini made an administrative note to the Plaintiff's medical record, in which he concluded that the ankle brace that had been recommended by Carlson was not warranted "for recreational purposes."   Id., Exh. A at unnumbered p. pp. 25-26.   Santini further concluded that, based on his examination of the Plaintiff on August 17, 1999, a more conservative approach would be reasonable.

On September 14, 1999, the Plaintiff was examined by Muth for ankle pain that

---

[8]Naproxen is "a nonsteroidal anti-inflammatory agent that is a propionic acid derivative, used for treatment of osteoarthritis, and rheumatoid arthritis."   Dorland's Medical Dictionary, at p. 1177 (29th ed. 2000).

13

the Plaintiff had experienced while playing basketball.  Id., at ¶14, Exh. A at unnumbered p. 24.  Muth noted that there was no swelling, and informed the Plaintiff of means to guard against repeated injury.  Muth also advised the Plaintiff to follow up with Santini regarding his need for an ankle brace.  On September 15, 1999, the Plaintiff submitted a request to F.W. Apple ("Apple"), who is the Assistant Warden at FCI-Sandstone, informing Apple that he had been placed on recreational restrictions on August 17, 1999, but had not received a written copy of that restriction.  Id., Exh. A at unnumbered p. 105.  Apple responded, on September 21, 1999, by informing the Plaintiff that neither the examination on August 17, 1999, by Santini, nor the orthopedic consultation on July 28, 1999, resulted in his being placed on any recreational restrictions.  Id., Exh. A at unnumbered p. 107.

On October 12, 1999, the Plaintiff was examined by Edmond for complaints of knots in his calf muscles, knee, and left ankle.  Id. at ¶14, Exh. A at unnumbered pp. 23-24.  Edmond observed that the Plaintiff was not in any acute distress, and had a normal range of motion.  Edmond also noted that the Plaintiff had accused the Bureau of Prisons ("BOP") of changing the findings of the orthopedic consultant, but concluded that there was no evidence to support the Plaintiff's claim.  Id., Exh. A at unnumbered p. 23.

14

On November 3, 1999, the Plaintiff submitted a request to Gutierrez, which sought another orthopedic examination. Id., Exh. A at unnumbered p. 150. In support of this request, the Plaintiff maintained that Carlson had directed him to return for a follow up visit in two (2) months. The Plaintiff further complained that he continued to experience pain during physical activities, and that the medical staff had failed to treat or help rehabilitate his injury. Gutierrez advised the Plaintiff that he was scheduled to see Santini regarding his medical concerns. On November 4, 1999, the Plaintiff submitted substantially the same request to Apple, asking that he receive a second orthopedic consultation. Id., Exh. A at unnumbered p 148. Apple responded to the Plaintiff's request on November 12, 1999, advising that he was scheduled to be evaluated by Santini, on November 29, 1999, in order to determine whether a return appointment to a consulting orthopedist would be warranted. Id., Exh. A at unnumbered p. 149.

On November 9, 1999, the Plaintiff was again examined by Edmond regarding complaints of ankle pain while playing basketball. Id., at ¶15, Exh. A at unnumbered p. 23. Edmond observed that there was no swelling in the Plaintiff's ankle, but advised the Plaintiff to refrain from action sports, and to apply ice to his ankle after walking. Edmond also provided the Plaintiff with Tylenol.

On November 29, 1999, the Plaintiff was examined by Santini, for complaints of both right and left ankle pain.  Id., at ¶15, Exh. A at unnumbered p. 22.   The Plaintiff claimed to have stopped playing basketball as a result of ankle pain, and was advised by Santini to refrain from all sporting activities.  Santini further educated the Plaintiff about ligament laxity, following a strain, and provided him with Naproxen, and an "Ace" wrap.  The Plaintiff was advised to return to the clinic if the ankle did not improve.

On December 20, 1999, the Plaintiff was examined by J. Mitchell ("Mitchell"), who is a nurse, regarding complaints of left ankle pain.  Id. at ¶16, Exh. A at unnumbered p. 21.  Mitchell observed that the Plaintiff was not in any acute distress, that he had a full range of motion, and minimal swelling.  Mitchell provided the Plaintiff with Tylenol, and directed him to apply heat to his ankle twice daily.

On January 21, 2000, the Plaintiff was again examined by Mitchell for continued ankle pain, and upon the Plaintiff's request for a medical slip to excuse him from shoveling snow.  Id., at ¶16, Exh. A at unnumbered p. 20.  Mitchell observed that the Plaintiff was not experiencing any acute distress, that he ambulated well, that there was no edema or deformity, and that he had a full range of motion, with no pain on palpitation.  Mitchell advised the Plaintiff to continue taking Tylenol, and to refrain

16

from running or jumping for two weeks.  Purportedly, Mitchell also became angry with the Plaintiff's persistent requests for a second orthopedic consultation, and expressed the opinion that such a consultation was not warranted for the Plaintiff's injuries. Statement of Claim, at p. 16.

On February 14, 2000, the Plaintiff was examined by Reudy, for left ankle pain and heel spurs.  Santini Decl., at ¶17, Exh. A at unnumbered p. 19.  Reudy observed that there was no ankle swelling or limitations on the Plaintiff's range of motion, and provided the Plaintiff with Naproxen.  Then, on July 27, 2000, the Plaintiff was examined by Mitchell for ankle pain, and in order to address the Plaintiff's request for another x-ray.  Id. at ¶17, Exh. A at unnumbered p. 18.  Mitchell observed that the Plaintiff was not experiencing any acute distress, that there was no edema or deformity, and that he had a full range of motion, with slight tenderness.  Mitchell ordered x-rays on the Plaintiff's foot and ankle, in order to rule out further degenerative changes.

On August 18, 2000, the Plaintiff was again examined by Reudy for complaints of left ankle pain.  Id. at ¶18, Exh. A at unnumbered p. 17.  Reudy observed that the Plaintiff had normal ambulation, a full range of motion, no swelling, a normal gait, and no limitations.  Reudy reviewed x-rays that had been performed on August 2, 2000,

17

which revealed tiny degenerative bone spurs and minimal degenerative changes.  <u>Id.</u>, Exh. A at unnumbered p. 57.  Reudy explained the x-ray results to the Plaintiff, but no change in treatment was indicated.

On March 5, 2001, the Plaintiff was examined by Edmond, on complaints of swelling in his knees and ankles.  <u>Id.</u>, Exh. A at unnumbered pp. 14-15.  Edmond observed that the x-rays of August 2, 2000, had come back negative.  He provided the Plaintiff with Naproxen, and advised him to follow up at sick call, as needed.  During an examination by Edmond on May 8, 2001, the Plaintiff again complained of pain in his ankle although he advised that the pain had subsided.  <u>Id.</u>, Exh. A at unnumbered p. 14.  No treatment related to the ankle was directed during that visit.

On June 26, 2001, the Plaintiff was examined by Santini concerning his desire to be referred for another orthopedic examination.  <u>Id.</u> at ¶19; Exh. A at unnumbered p. 12.  The Plaintiff advised that he had stopped running because of pain in his left hip, right knee, and left ankle, but that he was still able to lift weights.  Santini observed that the Plaintiff had a full range of motion in his left ankle, and no tenderness on palpation.  Santini noted that the previous x-rays had come back negative, and he provided the Plaintiff with Naproxen.  The Plaintiff was advised to follow up with Santini in six (6) weeks.

On July 22, 2002, the Plaintiff was examined by Ruedy for chronic pain in his ankle when he played sports.  Id. at ¶20, Exh. A at unnumbered p. 8.  Ruedy observed that the Plaintiff had normal ambulation, that there was no evidence of discomfort when walking, and no pain on palpation.  Ruedy reviewed the Plaintiff's previous x-rays, and no treatment was indicated.  On August 14, 2003, the Plaintiff was examined by Edmond on complaints of leg and foot pain when exercising.  Id., Exh. A at unnumbered p. 4.  Edmond observed that there was no foot deformity, swelling, tenderness, and that the Plaintiff displayed normal flexion and extension.  Edmond also noted that x-rays performed on July 11, 2001, revealed some arthritic changes.  The Plaintiff requested a Magnetic Resonance Imaging procedure during this examination.  However, the Plaintiff's medical record does not reveal any other complaints or treatments relating to his ankle through October 18, 2004.

### III.  Discussion

A.    Standard of Review.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Duffy v. Wolle, 123 F.3d 1026, 1040 (8th Cir. 1997), cert. denied, 523

U.S. 1137 (1998).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, Eide v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003); United Fire & Casualty Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fenney v. Dakota, Minnesota & Eastern R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003); Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 744 (8th Cir. 2002); Herring v. Canada Life Assurance, 207 F.3d 1026 (8th Cir. 2000).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of Civil

Procedure; see also, <u>Anderson v. Liberty Lobby, Inc.</u>, supra at 256; <u>Eddings v. City of Hot Springs, Ark.</u>, 323 F.3d 596, 602 (8th Cir. 2003).   Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, supra at 322; see also, <u>Mercer v. City of Cedar Rapids</u>, 308 F.3d 840, 843 (8th Cir. 2002); <u>Hammond v. Northland Counseling Center</u>, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, supra at 323; see also, <u>Bell Lumber and Pole Co. v. United States Fire Ins. Co.</u>, 60 F.3d 437, 441 (8th Cir. 1995); <u>McLaughlin v. Esselte Pendaflex Corp.</u>, 50 F.3d 507, 510 (8th Cir. 1995); <u>Settle v. Ross</u>, 992 F.3d 162, 163 (8th Cir. 1993).

      B.    <u>Legal Analysis</u>.  The crux of the Plaintiff's claim is his allegation that the Defendants adopted an improper course of treatment for his ankle injury, and that he has "tried in vain to receive proper care for the injury."  <u>Complaint</u>, at p. 4.  While the Plaintiff concedes that the medical record reflects that he was examined on many different occasions for ankle pain, he urges that it "fails to demonstrate the attitudes

of the medical personnel and the debasement and denial of the many requests for treatment by Plaintiff."   Brief in Opposition to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgement ("Plaintiff's Brief"), at p. 2.   In support of this assertion, the Plaintiff notes that he was not examined by an orthopedic specialist until ten (10) months after the injury, that he was never allowed a return visit to the orthopedic consultant, and that he was not examined by a physician during the nine (9) or ten (10) months following the injury, but was "left at the whims of [physician's assistants] and Nurses, and as a result has suffered injury that may or may not, be corrected through surgery."   Id., at pp. 2-4.   He asserts that such failures constituted "gross negligence, total disregard and deliberate indifference," to his serious medical need, and thereby violated his Eighth Amendment right against cruel and unusual punishment, and his  due process rights under the Fourteenth Amendment.[9]   Id. at p.

---

[9]As previously stated, the Plaintiff has also alleged that the conduct constituted a number of torts, including "Intentional infliction of physical stress; Negligent infliction of physical stress; Malfeasance of office; Abuse of position; Maleficence; and Maliciousness."   Complaint, at p. 6.   While such allegations may have evinced the Plaintiff's intent to raise a Federal Tort Claims Act ("FTCA") claim, the Plaintiff's subsequent submissions suggest that he did not intend such a construction,   Brief in Opposition of Defendant's Motion to Dismiss, Alternatively for Summary Judgment, at p. 26, and in any event, the United States has not been named as a Defendant, and the Record is bereft of any evidence to suggest that the Plaintiff has satisfied the FTCA's exhaustion requirement.   Accordingly, we decline to interpret the Plaintiff's

4.

The Defendants maintain that they are entitled to Judgment as a matter of law as to the Plaintiff's claims because: 1) the Plaintiff has not alleged facts sufficient to state a claim under the Eighth Amendment and Fourteenth Amendment; 2) the Defendants are entitled to qualified immunity; 3) the Defendants Muth and Mitchell[10] are entitled to absolute immunity; 4) that Plaintiff's claims against the Defendants Marty Anderson ("Anderson"), and T.C. Peterson ("Peterson"), are based on a theory of respondeat superior; and 5) the Plaintiff has failed to properly identify the Defendant Does 1-20.

In his response, the Plaintiff has conceded the merits of the Defendants' arguments with respect to Muth, Mitchell, Anderson, Peterson, and the Doe Defendants.  See, Plaintiff's Brief, at pp. 26-27.  However, he has strenuously argued that the conduct alleged constitutes deliberate indifference to his medical needs, and

_____

Complaint as having raised an FTCA claim.

[10]The Defendants' arguments with respect to Mitchell are somewhat paradoxical, since Mitchell was never named as a Defendant in the Plaintiff's suit, nor has she been served with process.  However, the Plaintiff has made factual allegations pertaining to Mitchell's treatment of his injured ankle, and it appears from the Plaintiff's subsequent submissions, that he intended to advance a claim against Mitchell. See Defendant's Brief at p. 26.

23

that the doctrine of qualified immunity does not shield the Defendants from liability.

When qualified immunity is asserted in a <u>Bivens</u>/Section 1983 action, we "must first consider the threshold question of whether, construed in a light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." <u>Andrews v. Fuoss</u>, --- F.3d. ---, 2005 WL 1797458, *2 (8th Cir., August 1, 2005), quoting <u>Crow v. Montgomery</u>, 403 F.3d 598, 601 (8th Cir. 2005); see <u>Wilson v. Layne</u>, 526 U.S. 603 (1999) [citations omitted].  "Only then do we ask whether that right was clearly established at the time of the alleged violation." <u>Id.</u>; see <u>Coonts v. Potts</u>, 316 F.3d 745, 750 (8th Cir. 2003), citing <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991).  Here, we find no constitutional violation but, nonetheless, we proceed to address the qualified immunity question in the interests of completeness.

     1.    <u>The Constitutional Claims</u>.  It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment.  See <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976).  "A prisoner's Eighth Amendment rights are violated if prison officials show 'deliberate indifference' to the prisoner's 'serious medical needs.'" <u>Olson v. Bloomberg</u>, 339 F.3d 730, 735 (8th Cir. 2003), quoting <u>Estelle v. Gamble</u>, supra at 106.  To prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he]

suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Id.

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002). However, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Finnegen v. Maire, 405 F.3d 694, 696 (8th Cir. 2005), quoting Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000), quoting in turn Estate of Rosenburg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999)("'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'"), quoting Dulany v. Carnahan, supra at 1239; DeGidio v. Pung, 920 F.2d 525, 532 (8th Cir. 1990)("[T]he eighth amendment does not transform

25

medical malpractice into a constitutional claim.").

Here, the Plaintiff has failed to establish a genuine issue of material fact that would allow him to recover on an asserted Eighth Amendment violation.  As an initial matter, we harbor serious doubts that the Plaintiff's ankle injury constituted an objectively serious medical need.  See Aswegen v. Henry, 49 F.3d 461, 464 (8th Cir. 1995)"To constitute an objectively serious medical need or deprivation of that need * * * the need or deprivation alleged must either be obvious to the layperson or supported by medical evidence, like a physician's diagnosis."), citing Bayerbach v. Sears, 49 F.3d 1324, 1326-1327 (8th Cir. 1995); Thomsen v. Ross, 368 F. Supp.2d 961, 973 (D. Minn. 2005)("Absent a medical diagnosis, a 'serious medical need' is 'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"), quoting Coleman v. Rahija, supra at 784.

The Plaintiff's injury has been diagnosed at different times as an ankle sprain, or strain, with mild degenerative and arthritic changes.  These are the only medical diagnoses on the Record, and they were based upon the medical staff's observations during numerous physical examinations, x-rays, and an orthopedic consultation. During those examinations, the Plaintiff generally had little, if any, decreased range of motion, swelling, or tenderness, in his ankle, and each of the x-ray results came back

negative for evidence of a fracture, or other abnormality.   Furthermore, the Record reflects that the Plaintiff continued to engage in physical activities, and on more than one occasion, the medical staff noted that the Plaintiff's complaints of pain were not commensurate with their physical examinations or the x-ray results.

Based on these observations and x-ray results, we are satisfied that the Plaintiff's injury was not so obvious that even a layperson would have recognized the need for medical care.   Accordingly, the only medical diagnosis on the Record is that the Plaintiff suffered from an ankle sprain/strain.   At least one Federal Court has held that a foot injury of the type experienced by the Plaintiff was not an objectively serious medical condition for the purposes of establishing an Eighth Amendment claim.   See, Chatin v. Artuz, 1999 WL 587855 (S.D. N.Y., August 4, 1999), affirmed by 28 Fed. Appx. 9, 10 (2nd Cir., January 3, 2001)("[The plaintiff's] condition, which medical staff at various stages of his treatment diagnosed as a sprained ankle, a bone spur, and a neuroma, did not rise to the level of seriousness that the Eighth Amendment requires.").[11]

---

[11]The facts and legal contentions addressed by the Court, in Chatin, are almost indistinguishable from those presented here.   There, the plaintiff was a prison inmate who alleged that the defendants had been deliberately indifferent to his serious medical need, when they failed to provide him prompt treatment for a foot injury sustained

However, even assuming an objectively serious medical condition, there is nothing in the Record, besides the Plaintiff's bare allegations, to support his assertion that the Defendants deliberately disregarded that condition.   On the contrary, the

---

while playing a game of soccer. <u>Chatin v. Artuz</u>, 1999 WL 587855 at *1 (S.D. N.Y., August 4, 1999)("Chatin I"). The plaintiff further alleged that the prison medical staff had been deliberately indifferent by failing to provide him treatment from a qualified physician, or to follow the treatment recommendations of an outside hospital. <u>Chatin v. Artuz</u>, 28 Fed. Appx. 9, 10 (2nd Cir., January 3, 2001)("Chatin II"). As a result of such asserted failures in treatment, the plaintiff alleged that he continued to suffer from constant pain, and swelling, in his foot, and that he stood an increased risk of suffering from gangrene, a stroke, or other serious ailments. <u>Chatin I</u>, at *2. He also alleged that, while he was physically able to walk fast, and lift weights, he could not jog, or play basketball. <u>Id.</u> In denying the plaintiff's claim, the District Court reasoned that, while "[the plaintiff's] alleged problems in his right foot may indeed be very real * * *[h]is pain is not, however, of the type contemplated for satisfaction of the standard [for an objectively serious medical condition]." <u>Chatin I</u>, at *3.

While the persuasive value of <u>Chatin</u> is necessarily limited by the different standard used by the Second Circuit for determining whether a plaintiff's medical need was sufficiently serious, see <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2nd Cir. 1994)(noting that a sufficiently serious condition is "a condition of urgency, one that may produce death, degeneration, or extreme pain"), quoting <u>Nance v. Kelly</u>, 912 F.2d 605, 607 (2nd Cir. 1990) (Pratt J., dissenting), Courts within our Circuit have reached similar conclusions. See, e.g., <u>Howard v. Anamosa State Penitentiary Health Services</u>, 2000 WL 34032935 at *15 (N.D. Iowa, July 24, 2000)(plaintiff who had been experiencing foot pain caused, in part, by post traumatic arthritis, was not deprived of treatment for a serious medical need, where he received x-rays, pain medication, and prosthetics, as needed); <u>Ward v. Dowd</u>, 707 F. Supp. 417, 418-419 (E.D. Mo. 1989)(soreness in neck and head was not sufficiently serious to establish an Eighth Amendment violation).

medical Record establishes that the Plaintiff received immediate, regular, and continuing care for his injury, which included crutches, and a splint;  pain medication, as needed; an Ace bandage; and instruction for rest and rehabilitative exercises.  Such modalities of treatment were based on the Defendants' diagnosis of the Plaintiff's injuries as a sprained, or strained ankle.  As there is nothing in the medical record to suggest to the Defendants that the Plaintiff's injury was more significant than that which was diagnosed, and since the Plaintiff has not offered any medical evidence to establish that the course of treatment adopted by the Defendant was deliberately indifferent to such an injury, the Plaintiff's dissatisfaction with his treatment does not give rise to an actionable Eighth Amendment claim.  See Beck v. Scon, 253 F.3d 330, 334 (8th Cir. 2001)("[A prisoner's] disagreements with prison medical staff about his care do not establish deliberate indifference and is not actionable."), citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)(Inmates do not have constitutional right to particular type of treatment; nothing in Eighth Amendment prevents prison doctors from exercising independent medical judgment.); see also Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997)(Where prison doctors treated inmate on numerous occasions and offered him a variety of pain killers, prison doctors were not deliberately indifferent.); Camberos v. Branstad, 73 F.3d 174 177 (8th Cir. 1995)

(Prison nurses were not deliberately indifferent because they chronicled inmate's numerous medical complaints, often referred him to a physician's assistant, and sent him to outside hospital seven times for further treatment).

While the Defendant has alleged claims under both the Eighth and Fourteenth Amendments, neither his Complaint, nor his subsequent submissions, contain allegations which would comprise a denial of Due Process, independent from his assertions of deliberate indifference to a serious medical need.  Accordingly, because the alleged conduct occurred while the Plaintiff was a prisoner, rather than a pretrial detainee, his claims for a deprivation of medical treatment necessarily fall under the Eighth, rather than the Fourteenth Amendment.

urther, to the extent that the Plaintiff had alleged a due process claim under the Fourteenth Amendment, which is independent of his Eighth Amendment claim, we find such a claim to be entirely without merit as the Plaintiff has not directed us to any conduct that would constitute a deprivation of either his procedural, or substantive due process rights.  Accordingly, we find that the Plaintiff has failed to allege a Fourteenth Amendment claim.

Since we find no genuine issue of material fact that would allow the Plaintiff to prove a constitutional violation, we recommend that the Defendants' Motion be

30

granted, and the Complaint be dismissed.  Further, even if the alleged conduct were sufficient to raise a constitutional claim, Summary Judgment would still be proper, since the Defendants are entitled to qualified immunity.

2.    Qualified Immunity.  Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, Wilson v. Layne, supra at 609; Young v. Harrison, 284 F.3d 863, 866 (8th Cir. 2002); Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001).  "To withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999); see also, Young v. Harrison, supra at 866-67.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly

31

established' at the time it was taken." Wilson v. Layne, supra at 614. The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 641 (1987). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).

Here, while we have concluded that the Defendants' treatment of the Plaintiff did not violate the Constitution, even if it had, the Defendants are clearly entitled to qualified immunity, as the unlawfulness of that treatment was far from apparent. See, Chatin I, supra at *3; Chatin II, supra at 10; Logan v. Clarke, supra at 649-50; Camberos v. Branstad, supra at 177; Long v. Nix, supra at 765. Accordingly, Summary Judgment is also warranted by the doctrine of qualified immunity.

NOW, THEREFORE, It is –

RECOMMENDED:

That the Defendants' Motion to Dismiss or, in the Alternative, for Summary

32

Judgment [Docket No. 26], be granted, and that the Plaintiff's Complaint [Docket No. 1] be dismissed with prejudice.


Dated:  August 11, 2005                     s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 26, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 26, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.